UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEPHEN MULKEY,

              Petitioner,                              Hon. Paul L. Maloney

v.                                            Case No. 1:07-CV-885

MARY BURGHUIS,

              Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on Mulkey's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Mulkey's petition be **denied**.


**BACKGROUND**

        As a result of events that allegedly occurred between 1989 and 1996, Petitioner was charged with eight counts of first degree criminal sexual conduct. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Patricia Endicott**

Petitioner married Endicott's mother on December 12, 1989. (Trial Transcript, January 11, 2005, 58-59). Endicott was seven years old at the time.[1] (Tr. 60). Immediately following this marriage, the relationship between Petitioner and Endicott "was going along good." (Tr. 60). A "few months" later, however, Petitioner began to "touch [Endicott] in places where a dad shouldn't touch you." (Tr. 60-61).

Initially, Petitioner would hug Endicott and touch her breasts. (Tr. 63). Endicott told Petitioner not to touch her, in response to which Petitioner instructed Endicott to not tell her mother. (Tr. 64). Petitioner "eventually" began touching Endicott's vagina and later began penetrating Endicott anally with his penis. (Tr. 64-65).

Endicott related an incident in which her mother went to visit a relative. (Tr. 65). Petitioner instructed Endicott's mother to telephone "as soon as she got there." (Tr. 65-66). Endicott's mother subsequently telephoned Petitioner, after which Petitioner instructed Endicott to "get in the bedroom and take [her] clothes off." (Tr. 66-67). Petitioner then entered Endicott's bedroom and took off his clothes. (Tr. 67). Petitioner then told Endicott to "bend over" and when she did so, he "stuck his penis in [her] anus and. . .vagina." (Tr. 68). Endicott testified that "just about every single day" Petitioner would engage in anal intercourse with her. (Tr. 69-70, 77-78).

Endicott complied with Petitioner's requests because she "was afraid." (Tr. 71-72). Petitioner was physically abusive toward Endicott and would "slap" and "hit" her. (Tr. 72-76). Endicott did not tell anybody about Petitioner's abuse because she "was afraid." (Tr. 76-77).

On "a couple" occasions, Endicott's mother walked in to her bedroom and observed

---

[1] Endicott turned eight years old on January 18, 1990. (Tr. 60).

Petitioner touching Endicott's breasts.  (Tr. 79-80).  When asked "what he was doing," Petitioner responded "nothing."  (Tr. 80).  Satisfied with this response, Endicott's mother "would turn around and walk out."  (Tr. 80).

Endicott eventually informed her mother of Petitioner's actions.  (Tr. 83).  When Endicott's mother "confronted" Petitioner about the matter, Petitioner "denied it."  (Tr. 83).  In response to Petitioner's assertion, Endicott's mother stated, "I believe you."  (Tr. 84).  Endicott testified that her mother's reaction "kept me from telling other people."  (Tr. 84-85).

Endicott eventually "couldn't take it no more" and moved in with her grandmother when she was "about 15" years of age.  (Tr. 85-87).  Approximately one year later, Endicott's mother "begged" Endicott to move back home.  (Tr. 87).  Endicott's mother complained that she would lose her food stamps if Endicott did not move back home.  (Tr. 87).  Endicott's mother also told Endicott that Petitioner "promised her" that "he would never touch [Endicott] again."  (Tr. 87).  Endicott agreed to move back home, after which Petitioner "stopped" assaulting her.  (Tr. 87-88).

In January 1997, Endicott reported to the police some of the acts of sexual assault to which Petitioner subjected her.  (Tr. 88-93).  However, because Endicott felt "very uncomfortable," "scared," and "embarrassed" discussing this matter, she did not report the most egregious aspects of Petitioner's conduct.  (Tr. 88-95).  Endicott later informed the police that she "did not want to proceed against [her] step-father."  (Tr. 95).  Endicott did this because she was "scared" and because her family members "blamed" her for the situation.  (Tr. 95-97).  Endicott concluded that because nobody believed her, she should just "let it go."  (Tr. 97-98).

After marrying, Endicott began therapy and eventually informed her therapist about Petitioner's conduct.  (Tr. 99-100).  However, Endicott subsequently told her therapist that she had

"fabricated" the allegations against Petitioner. (Tr. 100). Endicott testified that she did this because, after "block[ing]" Petitioner's actions out of her mind for so long, she "just wanted to forget them." (Tr. 101). Endicott believed that if she told her therapist that she had fabricated her allegations, the therapist would no longer want to discuss the matter. (Tr. 101). Endicott eventually reconsidered and reported all the acts of abuse to which Petitioner subjected her. (Tr. 101-06)

**Dr. Randall Haugen**

Dr. Haugen testified that he was a licensed psychologist who had been treating sexual offenders and victims of sexual abuse since 1990. (Trial Transcript, January 12, 2005, 7-9). Dr. Haugen never counseled or met with Patricia Endicott, or anybody else associated with this matter, but instead testified regarding his experience treating victims of sexual abuse. (Tr. 22, 26).

Dr. Haugen reported that "[t]he nature and how a victim responds to abuse really depends upon the personality make-up of the victim, their level of coping" as well as "the nature of the abuse." (Tr. 9). Nevertheless, there are "some common characteristics seen." (Tr. 9-10). The doctor reported that "[t]he majority of victims" never report the abuse they suffered. (Tr. 10). According to the doctor, "[y]ounger victims tend to be more egocentric" and "tend to feel there's something they could have done to prevent it and they may be blamed." (Tr. 11). Dr. Haugen further indicted that "if the consequences of disclosing it are more significant than the consequences of keeping it a secret, generally they're going to keep it a secret." (Tr. 11).

The doctor testified that if a child reports that she is being abused and "senses the parents' hesitation to believe," the child will "withdraw and, further, experience a sense of this is my fault" which "decreases" the likelihood that the child will ever report the abuse. (Tr. 13). The

doctor indicated that "[r]ecantations are common" when a young child's reports of abuse are not believed by a parent. (Tr. 14). When the parent does not believe the child's allegations, "it gives many victims the sense of this is natural, it's normal, it's something I'm doing to make it happen and I have to deal with it on my own." (Tr. 14). The doctor indicated that he has experienced in his own practice victims of sexual abuse recanting their allegations. (Tr. 20). Dr. Haugen indicated that such occurs "[b]ecause they're beginning to approach the emotions related to it," which they may have repressed for a long period of time. (Tr. 21-23).

Dr. Haugen observed that when a victim first reports abuse, she does not "come right out and reveal every single detail the first time they talk to somebody." (Tr. 14-15). The doctor further observed that it is not uncommon for a victim of sexual abuse to "leave the environment where the sexual abuse has been occurring, only then to re-enter that environment at some point in time," particularly "if the abuse has been happening over an extended period of time." (Tr. 17).

On cross-examination, Dr. Haugen acknowledged that false allegations of abuse "do occur," but "are relatively rare." (Tr. 27). The doctor indicated that when a person makes such false allegations she generally reports the alleged abuse "in a very matter-of-fact manner" without "fearfulness, anxiety, and emotion." (Tr. 27). The doctor testified that it "wouldn't be unusual" for a victim of sexual abuse to initially provide "only a little bit of the information," as such enables the victim to "feel[] a little bit more competent and more in control." (Tr. 30). The doctor further indicated that a victim of sexual abuse "may," with the passage of time, differently describe the details of her assault. (Tr. 30-31).

**Stephen Mulkey**

Petitioner testified that he married Patricia Endicott's mother in 1987. (Trial Transcript, January 12, 2005, 43). At the time, Patricia was "probably going on seven" years of age. (Tr. 45). After the marriage, "family life. . .was good." (Tr. 44). Patricia referred to Petitioner as "dad." (Tr. 45).

Patricia moved in with her grandmother after turning 15 years old. (Tr. 50). Petitioner testified that there "was a lot of problems" associated with this circumstance. (Tr. 51). Specifically, Patricia's boyfriend, of whom Petitioner and Patricia's mother did not approve, would visit Patricia at her grandmother's residence. (Tr. 52). Patricia also "run up" her grandmother's telephone bill and was "sneaking in and out." (Tr. 53). Patricia's mother subsequently persuaded Patricia to return home. (Tr. 53-54). Patricia, however, did not want to move back home and argued with her mother about the matter. (Tr. 54). It was "around that time" that Patricia first alleged that she has been sexually assaulted by Petitioner. (Tr. 53).

Petitioner denied ever "molest[ing]" Patricia. (Tr. 49). He likewise denied ever engaging in penis-to-vagina or penis-to-rectum intercourse with Patricia. (Tr. 49). He further denied ever doing "any of those horrible things" described by Patricia Endicott. (Tr. 54). On cross-examination, Petitioner acknowledged that after Patricia initially reported her allegations to the police (in 1997), Patricia mother contacted the police "and told them not to come because this was going to be handled as just a family matter." (Tr. 67).

Following the presentation of evidence, the jury found Petitioner guilty of one count of first degree criminal sexual conduct. (Trial Transcript, January 13, 2005, 6). Petitioner was sentenced to serve 18-40 years in prison. (Sentencing Transcript, February 28, 2005, 11). Petitioner

appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

I.      The trial court violated Appellant's due process right to trial by an impartial jury by allowing jurors to submit questions for witnesses during the trial.

II.     The trial court violated Appellant's due process right to the assistance of counsel at a critical stage of trial by excusing a juror at the commencement of deliberations and replacing the juror with an alternate in defense trial counsel's absence.

III.    Defense trial counsel was constitutionally ineffective in failing to call a witness to show the complainant's character for untruthfulness.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Mulkey,* 2006 WL 3373067 (Mich. Ct. App., Nov. 21, 2006). Asserting the same claims, Petitioner later moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Mulkey,* No. 132934, Order (Mich., April 24, 2007). On September 7, 2007, Petitioner initiated the present action in which he asserts the three issues identified above.

**STANDARD OF REVIEW**

Mulkey's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply

because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,*529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir.

2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**       **Juror Questioning Claim**  (Habeas Claim I)

      Immediately after the jury was selected, and before opening statements or the presentation of evidence, the trial judge made the following comments to the jury:

> The other thing you're allowed to do is ask questions of the witnesses. Just before each witness is excused, the last thing that will happen is I'll turn to you folks, inquire of you whether you have any questions of that witness. If you do, you need to write them out. We cannot accept spoken or oral questions. I need to review them to make certain that they're proper, and not objectionable, as do the lawyers. If there is no objection to the question or questions, then I'll read them to the witness. This is not meant to discourage you in any way from asking questions. You, after all, are the fact finders. You've got to understand the case in order to reach a decision as to the facts. And if doing so requires you to ask a question or more than one question, then I encourage you to do so and will certainly assist you in doing that by reading your questions to the witness.

(Trial Transcript, January 11, 2005, 35-36).

After both attorneys completed their questioning of Patricia Endicott, the jurors submitted a "couple of questions" for the witness. (Tr. 142). The jurors were instructed to put their questions in writing so that they could be reviewed by the court and counsel. (Tr. 142). After this was completed, the trial judge conducted further questioning of the witness.[2] (Tr. 142-45). After the trial judge completed his questioning, the attorneys were permitted to further question Ms. Endicott. (Tr. 145-48). In his first habeas claim, Petitioner asserts that permitting the jurors to ask questions of Patricia Endicott violated his constitutional right to due process.[3] Petitioner's claim fails because it has been procedurally defaulted and, furthermore, is without merit.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the last state court rendering a judgment in the matter must have actually enforced the state procedural rule, and (3)

---

[2] The record does not reflect the precise questions submitted by the jurors. The record likewise does not indicate whether either party objected to any of these questions and, if so, how such objections were resolved.

[3] The jurors were given the opportunity to submit questions to the other witnesses, but declined to do so. (Dkt. #15 at 42; Dkt. #16 at 14).

application of the procedural rule in question must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004); *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

All of these elements are satisfied in this instance. First, Michigan employs a procedural rule that generally obligates defendants to preserve all constitutional and non-constitutional claims by first asserting them at trial. *See Warlick v. Romanowski*, 2010 WL 729528 at *5 (6th Cir., Mar. 3, 2010) (citing *People v. Grant*, 520 N.W.2d 123, 128 (Mich. 1994)). Second, during his trial, Petitioner neither objected to the trial judge's initial decision (articulated before the presentation of evidence) to generally allow the jurors to submit questions nor to the trial judge's subsequent determination to permit jurors to submit questions to Patricia Endicott. The Michigan Court of Appeals, the last state court that rendered a judgment in this matter, determined that this issue was "unpreserved" because Petitioner "failed to object at trial." *Mulkey*, 2006 WL 3373067 at *1. While the court of appeals nevertheless reviewed this claim "for plain error affecting defendant's substantial rights," such does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default"). Finally, the procedural rule in question constitutes an adequate and independent basis to preclude review by this Court because the rule was "firmly established and regularly followed by the time as of which it [was] to be applied." *Romanowski*, 2010 WL 729528 at *5.

Petitioner, therefore, has procedurally defaulted this particular claim. Accordingly, federal habeas review is available only if he can establish either (1) the existence of cause for his

default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement, Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Petitioner has failed to articulate cause for his failure to comply with the relevant procedural rule and has not identified any prejudice resulting therefrom. Likewise, Petitioner has failed to advance any argument that failure by this Court to consider the merits of this claim would result in a fundamental miscarriage of justice. Accordingly, because Petitioner has procedurally defaulted this claim, the Court is precluded from considering such. Furthermore, even if Petitioner could overcome his default of this claim, the result is the same as this claim is without merit.

As discussed above, Petitioner is entitled to habeas relief only if he is able to demonstrate that the resolution by the state courts of his constitutional claims either (1) was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. The latter provision is inapplicable to this particular claim, as Petitioner's claim does not concern an assessment or evaluation of evidence presented during Petitioner's trial.

With respect to the former provision, as has been observed, the United States Supreme Court has never clearly established that a criminal defendant's constitutional rights are violated where jurors are permitted to submit questions to a witness. *See, e.g., Rogers v. Wong*, 637 F.Supp.2d 807, 825-26 (E.D. Cal. 2009). Moreover, the manner in which the jurors presented their questions to Patricia Endicott did not deprive Petitioner of a fair trial. The jurors' questions were submitted in writing, after the parties completed their questioning. Before being presented to the witness, the admissibility of the jurors' questions was determined off the record by the trial judge and parties. Also, after the jurors' questions were presented, the parties were permitted to further question the witness. Such procedures and safeguards have been found to sufficiently protect a criminal defendant's constitutional right to a fair trial. *See, e.g., Baugh v. Quigley*, 2007 WL 2413089 at *6 (E.D. Mich., Aug. 21, 2007); *Wheeler v. Jones*, 2003 WL 124029 at *6 (6th Cir., Jan. 13, 2003). Accordingly, this claim is without merit.


**II.**          **Juror Dismissal Claim**  (Habeas Claim II)

Late on the afternoon of January 12, 2005, after closing arguments were completed, the trial judge provided the jury with their final instructions. (Trial Transcript, January 12, 2005, 61-80). The judge completed his instructions at approximately 4:50 p.m., at which point he

discharged the jury with instructions that they were not to begin their deliberations until the following morning. (Tr. 79-80). The following morning, before the jury began its deliberations, the trial judge excused one of the jurors, replacing him with one of the alternate jurors. (Trial Transcript, January 13, 2005, 3-5). While Petitioner was present in the courtroom when the trial judge accomplished this, his attorney was not. (Tr. 3). Petitioner asserts that the trial judge's actions violated his constitutional right to the assistance of counsel.

Observing that Petitioner failed to object to this issue prior to the conclusion of his trial, the Michigan Court of Appeals found that this issue was "unpreserved." Accordingly, as discussed above, Petitioner has procedurally defaulted this particular claim. Petitioner has not asserted the existence of cause for his failure to comply with the relevant procedural rule and has not identified any prejudice resulting therefrom. Petitioner has also failed to advance any argument that failure by this Court to consider the merits of this claim would result in a fundamental miscarriage of justice. Petitioner has, therefore, procedurally defaulted this claim, precluding its consideration by this Court. Moreover, even if Petitioner could overcome his default of this claim, the result is the same as this claim is without merit.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right. . .to have the Assistance of Counsel for his defence." U.S. Const. amend VI. The "plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" *United States v. Wade*, 388 U.S. 218, 225 (1967). Accordingly, a criminal defendant has the right to the advice of counsel at "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.* at 226.

The Supreme Court subsequently began referring to any stage at which the right of counsel attached as a "critical stage" of the prosecution. *See Michigan v. Jackson*, 475 U.S. 625, 632 n.5 (1986). Thus, a criminal defendant has the right to the assistance of counsel at any "critical stage" of the criminal justice process. If a criminal defendant is deprived of counsel at a "critical stage" of the process, prejudice of constitutional magnitude is presumed to have resulted therefrom. *See Olden v. United States*, 224 F.3d 561, 568 (6th Cir. 2000) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984) ("a trial is unfair if the accused is denied counsel at a critical stage of his trial").

The Court is unable to locate any authority definitively addressing whether a hearing to consider the substitution of a juror, after the jury has been instructed but prior to the outset of deliberations, constitutes a "critical stage" of the criminal justice process. This particular question need not be resolved, however, because the Court finds that Petitioner was not deprived of counsel at this stage of his criminal trial.

At the outset of the proceeding in question, the trial judge stated that he had spoken with Petitioner's counsel on the telephone concerning the issue of juror substitution. (Trial Transcript, January 13, 2005, 3). The judge then informed Petitioner that his attorney was available to speak with him by telephone if he so desired. (Tr. 4-5). Petitioner declined this offer and made no objection to the trial judge's decision to seat the alternate juror. (Tr. 5). Petitioner's counsel was present later that day when the jury returned a verdict and made no objection to the trial judge's actions earlier that morning. (Tr. 6-10).

In sum, prior to the juror substitution, Petitioner had an opportunity to consult with his attorney, who did, in fact, discuss the matter with the trial judge. While counsel's actual

presence in the courtroom during this circumstance would undoubtedly have been preferable, Petitioner was nevertheless represented by counsel when the trial court considered the matter in question. As the Supreme Court recently observed:

> Our precedents do not clearly hold that counsel's participation by speaker phone should be treated as a "complete denial of counsel," on par with total absence. Even if we agree with Van Patten that a lawyer physically present will tend to perform better than one on the phone, it does not necessarily follow that mere telephone contact amounted to total absence or "prevented [counsel] from assisting the accused," so as to entail application of *Cronic*. The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time.

*Wright v. Van Patten*, 552 U.S. 120, 124-25 (2008).


**III.        Ineffective Assistance of Counsel Claim**  (Habeas Claim III)

In support of his claim before the Michigan Court of Appeals that his trial attorney improperly failed to question Ricky Hills at trial, Petitioner secured affidavits from Ricky Hills and Jacqueline Ouvry. (Dkt. #19). In his affidavit, Hills asserted the following:

1.        I am Stephen Mulkey's brother-in-law.

2.        Patricia Endicott is my niece and I have known her all of her life.

3.        In my opinion, Patricia Endicott is a liar.

4.        Patricia Endicott had a reputation for sneaking guys into her bedroom despite being told not to, when she was living with my mother.

5.        Patricia Endicott never mentioned anything about alleged sexual activity with Stephen Mulkey until after she married Clyde Endicott. I believe Clyde to

have a vendetta against Stephen Mulkey.

6.      I was not contacted by anyone for the defense prior to Stephen Mulkey's January 11-13, 2005 trial.

7.      I would have been available to testify at trial, had I been called.

In her affidavit, Ouvry asserted the following:

1.      I am a paralegal at the State Appellate Defender Office.

2.      On May 1, 2006, I spoke with defense trial counsel Kenneth Marks. He informed me he remembered Mr. Mulkey providing a list of potential witnesses before trial. Mr. Marks did not recall if any were specifically regarding the complainant's character for untruthfulness. I indicated that there was no witness list from Mr. Mulkey in the file that we had previously received from Mr. Marks. He replied that he was out of State. He promised to make sure that we were sent the entire file and call when he returned to the State.

3.      On June 2, 2006, I spoke with Mr. Marks again. He indicated that he looked, and he had no other records. He further stated that he did remember that Mr. Mulkey and his wife came in to the office and there was a discussion about witnesses. However, Mr. Marks did not remember if that was in reference to character witnesses and he could not remember if there was a discussion regarding witnesses about the complainant's character.

Petitioner also submitted an affidavit in support of his appeal, in which he asserted the following:

1.      I am the Defendant in this case.

2.      I met several times before trial with my defense attorney, Kenneth Marks.

3.      At that time, I gave my attorney a list of defense witnesses, including Ricky Hills.

4.      I told my attorney that Ricky Hills would testify to Patricia Endicott's character for untruthfulness.

5.      My attorney told me he did not need to call my witnesses.

(Dkt. #19).

Petitioner asserts that his constitutional right to the effective assistance of counsel was violated by his trial counsel's failure to question Ricky Hills at trial.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).

The affidavits detailed above establish that defense counsel was aware of Ricky Hills and the purpose for which Petitioner suggested that he be called as a witness. For some reason, counsel made a strategic decision not to call Hills as a witness at trial. Counsel may have questioned

whether Hills' testimony would be admissible or perhaps counsel was reluctant for some reason to expose Hills to cross-examination. Because Petitioner offers no evidence from counsel, the Court can only speculate as to the reasons underlying counsel's decision. More importantly, Petitioner has failed to overcome the presumption that counsel's decision constituted sound trial strategy.

The Court is also not persuaded that a different outcome would have resulted had Hills testified. Hills did not assert that he possessed first-hand knowledge about the incidents in question, but instead simply challenged Patricia Endicott's credibility, a matter which defense counsel explored at length on cross-examination of Endicott. Counsel also explored this issue on cross examination of Dr. Haugen and examination of Petitioner.

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim, stating the following:

> The record does not disclose to what extent, if any, defense counsel considered calling witnesses to testify about the victim's character for untruthfulness, or his reasons for deciding not to do so. Therefore, we cannot conclude that defendant has overcome the presumption that the failure to call such witnesses was anything but sound trial strategy. We additionally find that defendant has failed to show that he was denied a substantial defense by defense counsel's failure to call his brother-in-law to testify. In *Dixon,* a criminal sexual assault case, the defense counsel's failure to call a witness to testify that the victim consented to sex did not deprive the defendant of the defense of consent because counsel raised the defense through cross-examination of the victim and in closing argument. Like in *Dixon,* the issue of the victim's credibility here was already before the jury by way of the victim's and defendant's testimony, as well as defense counsel's opening and closing arguments. Accordingly, we find that defendant failed to establish that he was denied any substantial defense.
>
> In reaching our conclusion, we note that defendant asserts that it is highly likely that the jury would have acquitted him if additional evidence of the victim's character for untruthfulness had been presented at trial. We disagree. The record does not establish that

defense counsel's failure to call defendant's brother-in-law as a witness was outcome-determinative. The statements provided by the defendant's brother-in-law were somewhat duplicative of evidence presented at trial, and they did not include any credible information to specifically contradict the victim's charges against defendant. Because defense counsel was able to raise the issue of the victim's credibility as a defense at trial, and because defendant's brother-in-law apparently possessed no information related to the charged offense itself, we have no basis on which to conclude that defense counsel's failure to call the potential witness was outcome-determinative. For these reasons, we find that defendant has failed to establish his claimed denial of effective assistance of counsel.

*Mulkey*, 2006 WL 3373067 at *4-5 (internal citations omitted).

The determination by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Mulkey's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                        Respectfully submitted,

Date:  June 23, 2010                 /s/ Ellen S. Carmody     
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge